UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ROGERS INDUSTRIAL PRODUCTS, INC, et al., | ) ) ) | CASE NO. 5:09CV1181 |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) ) | **CLAIMS CONSTRUCTION** |
| HF RUBBER MACHINERY, INC., et al, | ) ) | **MEMORANDUM OPINION** |
| DEFENDANTS. | ) ) | |

Plaintiffs Rogers Industrial Products, Inc. and J.R.C. Leasing Co. ("plaintiffs") filed the above-captioned case on May 21, 2009, asserting federal question jurisdiction and alleging one count of infringement of U.S. Patent No. 7,442,335 ("the '335 Patent" or "the patent in suit") by defendants HF Rubber Machinery Inc. and Harburg-Freudenburger Maschinenbau GMBH ("defendants"). The '335 Patent is entitled "Apparatus and Method for Loading and Unloading a Tire Press." On October 15, 2009, defendants filed their answer and counterclaim alleging claims of noninfringement, patent invalidity, and patent unenforceability.

A court's first task in determining whether an accused device or process infringes a patent is to construe the claims to ascertain their proper scope. *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003). Accordingly, on July 2, 2010, the Court conducted a hearing pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), which held that the construction of a patent, including terms of art contained in its claims, is a matter exclusively within the province of the court. Prior to the hearing, the parties submitted a Joint Claims Construction Chart (Doc. No. 25), claims construction briefs (Defendants' brief,

1

Doc. No. 26; Plaintiffs' brief, Doc. No. 27) and response briefs (Defendants' response, Doc. No. 30; Plaintiffs' response,[1] Doc. No. 32). Upon consideration of the parties' briefs and arguments, the Court construes the disputed terms as set forth herein. This opinion does not yet address on the merits the ultimate question of infringement or any of the counterclaims.

## I. LEGAL STANDARD

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). "Words of a claim 'are generally given their ordinary and customary meaning.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a claim term "is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1313.

Sometimes the meaning of a term "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314. "In such circumstances, general purpose dictionaries may be helpful." *Id*. However, this is not always the case, especially because "patentees frequently use terms idiosyncratically[.]" *Id.* Therefore, the court must look to "'those sources available to the public that show what a person of skill in the art would have understood the disputed claim language to mean.'" *Id*. (quoting *Innova*, 381 F.3d at 1116). These include "'the words of the claims themselves, the remainder of the specification,

---

[1] Plaintiffs' response brief is styled as a "reply."

the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Id*.

"Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id*. However, the claims of a patent do not stand alone. "[T]hey are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims. For that reason, claims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*). The specification is "dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582; *see also* 35 U.S.C § 112, ¶ 1 (the patent specification must contain a "full, clear, concise, and exact" description of the invention); *Phillips*, 415 F.3d at 1311. Although the specification must be consulted when construing claims, it is the claim itself that is "the measure of [the patentee's] right to relief, and while the specification may be referred to to limit the claim, it can never be made available to expand it." *Johnson & Johnston Assoc. Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) (quoting *McClain v. Ortmayer*, 141 U.S. 419, 424 (1891)).

In addition to consulting the specification, the court should also consider the patent's prosecution history, which was "created by the patentee in attempting to explain and obtain the patent." *Phillips*, 415 F.3d at 1317.[2] However, in doing so, the court must keep in mind that "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id*.

---

[2] *Phillips* states that the prosecution history should be considered "if it is in evidence." 415 F.3d at 1317. The parties have attached portions of the prosecution history to their briefs. Therefore, to the extent it was made available, the Court considered the prosecution history.

Finally, although intrinsic evidence is of primary importance in claim construction, the Federal Circuit has authorized district courts to "rely on extrinsic evidence, which consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* (internal quotation marks omitted). Such evidence "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean[.]" *Id.* at 1319.

There is a special class of claim language, relevant in the instant case, referred to as "means-plus-function." Construing such claim terms is governed by 35 U.S.C. § 112, ¶ 6 which provides:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

## II. CLAIM CONSTRUCTION

There are four disputed terms contained in the eight claims of the patent: "opening/closing means," contained in Claims 1, 4, 6, and 8; "providing," contained in all but Claim 5; "operatively attached," contained in Claims 1, 4, 6, and 8; and a similar term, "operatively connected," contained in Claims 1, 3, 6, and 8.

### A. "Opening/Closing Means"

Claims 1 and 6 contain the following disputed element:

>   opening/closing means for selectively opening and closing the tire press by moving the top plate substantially in a vertically aligned orientation with respect to the bottom plate[.]

Claims 4 and 8 contain virtually the same disputed language, with minor modifications.

Even though the parties agree that this disputed element is a means-plus-function limitation governed by 35 U.S.C. § 112, ¶ 6, the Court must independently determine whether that is so. *See Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 702 (Fed. Cir. 1998) ("[w]hether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction and is therefore a question of law").

"[T]he use of the word 'means' triggers a presumption that the inventor used this term advisedly to invoke the statutory mandates for means-plus-function clauses." *York Products, Inc. v. Central Tractor Farm & Family Center*, 99 F.3d 1568, 1574 (Fed. Cir. 1996). Two rules, however, overcome this presumption.

>   First, a claim element that uses the word "means" but recites no function corresponding to the means does not invoke § 112, ¶ 6. Second, even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply.

*Rodime PLC v. Seagate Technologies, Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999) (internal citations omitted).

>   Once a court determines that § 112, ¶ 6 applies, construction of a means-plus-function term involves two steps. First, the court must identify the claimed function, "staying true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g, Inc.*, 334 F.3d at 1321. Next, a court must "ascertain the corresponding structures in the written description that perform those functions." *Id.* A structure is corresponding "only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (*quoting B.Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

*Baran v. Medical Device Technologies, Inc.*, 519 F.Supp.2d 698, 704 (N.D. Ohio 2007), *aff'd* 616 F.3d 1309 (Fed. Cir. 2010).

> In order to prove literal infringement of a means-plus-function claim, the plaintiff must show that the accused device performs the recited function through structure that is the same as or equivalent to the corresponding structure set forth in the specification. 35 U.S.C. § 112, ¶ 6.

*Baran v. Medical Device Technologies, Inc.*, 616 F.3d at 1316-17.

Here, the "means" element in the claim specifies that it is for the function of "opening/closing" but it does not recite any structure or material for performing that function. Therefore, § 112, ¶ 6 does apply and this element contains a means-plus-function limitation.

Section 112, ¶ 6, "requires both identification of the claimed function and identification of the structure in the written description necessary to perform that function." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). "The statute does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim. Nor does the statute permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Id*.

Defendants argue that the term should be construed to include the following structures: "guide posts (20) and lock rods (22) extending between said top (12) and bottom (16) plates, a pneumatic cylinder (64) engaging and disengaging a pair of arms (58, 60) of a split lock ring (56) encircling a notched end (26) of each lock rod (22), and a hydraulic piston (96) engaging and disengaging said lock ring (56)." In other words, defendants are of the view that "opening/closing" includes "unlocking/locking."

Plaintiffs argue that this disputed term should be construed to include only the "guide rods and hydraulic cylinders and their equivalents" which simply open and close the tire

press. Plaintiffs assert that the claimed method of the patent in suit only addresses the movement of tires into and out of the press and has nothing to do with the curing of tires *per se* and, therefore, need not be performed in conjunction with a locking or unlocking of the tire press, notwithstanding a disclosure that might also support an invention relating to locking/unlocking.[3]

Plaintiffs argue that it would be error to include all of the components relating to the locking and unlocking of the tire press for several reasons. First, only the guide rods and the hydraulic cylinders are used to move the top plate with respect to the bottom plate. Second, the guide rods and the locking rods function independently and the locking rods have nothing to do with moving the top plate with respect to the bottom plate. Third, the inventor of the '335 Patent also has another patent (U.S. Patent 6,908,584 ["the '584 Patent"]) based on the same disclosure as the patent in suit which claims a method for locking a tire press; in plaintiffs' view, this clearly reflects the inventor's intention that opening/closing and locking/unlocking are entirely separate.[4]

Because the element of "opening/closing means" does not recite any structure for performing that function, the Court must look to the specification to determine all the structure

---

[3] The Court notes that the patent in suit is very unusual. It is entitled "Apparatus and Method for Loading and Unloading a Tire Press" and the claims seem directed at such an apparatus and method. However, although the specification does include three paragraphs devoted respectively to the "tire loader assembly **83**," "the tire unloading mechanism **84**," and "the green tire holder **85**" (all three of which are shown in the patent drawings), none of the sub-elements of those components (namely, the "moving means **104**," the "base member **120**," the "holder arm **124**," the "tire tray **130**," the "take away conveyor **140**," and the "unloader arms **150**") are shown in the patent drawings. In other words, the very apparatus and method that is supposedly patented is not actually depicted in detail in the drawings.

A patent provides an inventor with exclusive rights to prevent others from making, using or selling the invention *in exchange for* full disclosure of the invention. This disclosure allows the public to practice the invention after the patent expires as well as to learn from it even during the term of the patent. It might be argued that the patentee in this case has not completely kept his end of the bargain. However, because that goes to the question of the validity and/or enforceability of the patent, a final determination in that regard must be for another day.

[4] The specification describes the patent in suit as a continuation of '584 Patent (Col. 1, lines 4-12), which is entitled "Apparatus and Method for Locking a Tire Vulcanizing Press."

that performs the function. *Micro Chem.*, 194 F.3d at 1257-58. After doing so, the Court concludes that plaintiffs have the better view.

The Background of the Invention describes the known art of tire presses to have either "lock rods which must be substantially identical in length[ ]" (Col. 1, ll. 27-28), or lock rods that are integrated into the guide posts, i.e., "the lock rods and the guide posts [. . .] are the same mechanism." (Col. 1, ll. 39-40.) Where lock rods are identical in length, if the lengths are not extremely precise, this can cause "an uneven load distribution which results in uneven strains and stresses[ ]" (Col. 1, ll. 32-33) and, possibly, tire defects. Where guide posts and lock rods are integrated, there will be "increased maintenance[ ]" (Col. 1, ll. 40-42) because the forces necessary for locking the tire press "may cause deflection in the guide posts over time." (Col. 1, ll. 45-46.) The disclosure states that "[t]he present invention provides methods and apparatuses for locking a tire press, which has independent lock rods and guide posts, and does not require the lock rods to be exactly equal in length and yet, provides equal tension and axial forces in all the lock rods when the tire press is closed and locked." (Col. 1, ll. 48-53.)

The Summary of the Invention states that "[a]ccording to one aspect of the present invention, a new and improved locking mechanism for a tire press is provided." (Col. 1, ll. 57-58.) Obviously, one way that the locking mechanism is improved is by *not* integrating it with the guide posts used to open and close the tire press; that is, the invention includes "a plurality of guide posts adapted to maintain proper alignment of the upper mold and the lower mold as the tire press opens and closes[ ]" *and* "[a] plurality of lock rods, which are independent of the guide posts[.]" (Col. 1, ll. 61-64.)

The Description of the Preferred Embodiment clearly states that "[i]t is important that the lock rods **22** be independent from the guide rods **20**." (Col. 3, ll. 37-38.) It further

8

emphasizes that the guide rods have a very specific and different function when compared to the lock rods: "If guide rods **20** are utilized to perform a locking function in the tire press **10**, the guide rods **20** will experience unwanted deflection, which could ultimately result in imperfect sealing of the molds **14**, **18** during a curing cycle." (Col. 3, ll. 41-44.)

When the specification is examined, it becomes clear that, although locking and unlocking occurs at the same time as opening and closing, the elements responsible for locking and unlocking are not inherent parts of the "opening/closing" element. This is true even though a very large part of the specification is devoted to describing the novel locking mechanism of the tire press. *See, e.g.,* Col. 3, lines 27-35; Col. 4, lines 9-12; Col. 4, lines 23-30; Col. 6, lines 9-27. Including the locking/unlocking components in the construction of "opening/closing means" would violate the principle of construction that says that the specification may be used to limit a claim, but not to expand it. *Johnson & Johnston Assoc. Inc. v. R.E. Service Co., Inc.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002).

Another indication that the defendants' construction of this element is incorrect can be found in the prosecution history of the patent in suit. In an office action dated December 15, 2006, the Examiner challenged the "opening/closing means" limitation in Claim 1, stating: "it is unclear what constitutes the opening/closing means[ ]" and "it is unclear as to what extent the locking mechanisms/means are necessarily part of the opening/closing means." (Doc. No. 26, Exh. B.) In response, on March 15, 2007, the inventor modified Claim 1, in relevant part, as follows: "[. . .] opening/closing means for selectively opening and closing the press by moving <u>and locking</u> the top plate with respect to the bottom plate[.]" (Doc. No. 32-1 at 6, underlining in original.) Later, on July 5, 2008, in response to another office action dated March 6, 2008, the inventor removed the phrase "and locking" and settled on the opening/closing language that is

9

now in the actual patent. (Doc. No. 32-3 at 2.) On September 5, 2008, the Examiner sent the Notice of Allowance and Fee(s) Due, a Notice of Allowability, and an Examiner's Amendment. In that amendment, the Examiner did not modify the final "opening/closing" language from the inventor's July 5th submission.

Plaintiffs argue that the Examiner's approval of Claim 1 *without* the additional "and locking" phrase indicates that locking/unlocking is not an inherent component of the "opening/closing means." Defendants, however, insist that the Examiner's initial critique of Claim 1 on December 15, 2006 did not challenge *whether*, but only *to what extent*, the locking mechanism was part of the "opening closing means." Therefore, according to the defendants, approving the claim without the insertion of "and locking" has no real significance. The Court finds no merit in this argument, since the "extent" to which the locking mechanism is part of the opening/closing mechanism could certainly be zero. The Court concludes that plaintiffs have the better view with respect to construction of this disputed term.

In light of the above, the Court construes the "opening/closing means" in Claims 1, 4, 6 and 8 as follows: "guide rods and hydraulic cylinders and their equivalents."

**B.    "Providing"**

All but Claim 5 use the disputed term "providing" in various ways:

- providing a tire press (Claims 1, 4, 6, 8);
- providing a green tire holder (Claims 1, 3, 6, 8);
- providing a tire loader assembly (Claims 1, 6, 8);
- providing a take away conveyor (Claims 2, 4, 7); and
- providing an unloading mechanism (Claims 2, 4, 7).

Plaintiffs ask the Court to construe this term as "supplying or making available." Defendants ask the Court to construe the term as "building and making available."

As already noted, where a word (such as, in this case, "providing") is not specifically defined by the inventor, it is "generally given [its] ordinary and customary meaning." *Victronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention[.]" *Phillips*, 415 F.3d at 1313. "Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*; *see also DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1324 (Fed. Cir. 2001) ("We cannot look at the ordinary meaning of the term [. . .] in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history[.]"); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed.Cir.2005) (intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention.").

Here, the specification sets forth the details of a method for operating a very particular, novel apparatus. Without a doubt, one must "provid[e]" this very particular apparatus, not simply *any* apparatus already known in the art. However, the claims themselves are *method* claims. There is nothing in the claims to suggest that the *method-user* must also be the *apparatus-builder*. Rather, the method-user must simply "provide" the very particular apparatus described. Used in its ordinary dictionary sense, "providing" the apparatus for the method does not suggest the necessity of "building" that apparatus.

11

Accordingly, the Court construes "providing" as "supplying or making available," while also recognizing that what must be supplied or made available is a very particular apparatus.

C.     **"Operatively Attached" and "Operatively Connected"**

These two disputed terms are virtually identical and were argued together at the *Markman* hearing and in the briefs.

Claims 1, 6 and 8 contained both disputed terms "operatively attached" and "operatively connected." In context, each of these claims, in relevant part,[5] uses these terms as follows:

> A method comprising the steps of:
>
>> providing a tire press comprising a top plate; a bottom plate; an upper tire mold *operatively attached* to the top plate; a bottom tire mold *operatively attached* to the bottom plate; [. . .];
>>
>> providing a green tire holder comprising a base member; a holder arm having a first end rotatably and liftably connected to the base member; and a tire tray *operatively connected* to the second end of the holder arm; [. . .]

Claim 4 contains only the term "operatively attached" (i.e., "an upper tire mold operatively attached to the top plate; a bottom tire mold operatively attached to the bottom plate") and Claim 3 contains only the term "operatively connected" (i.e., "a tire tray operatively connected to a second end of the holder arm").

Defendants argue that the terms should be construed, respectively, to mean "attached to achieve an intended function" and "connected to achieve an intended function."

---

[5] The quoted paragraphs are the first two paragraphs of Claim 1; Claims 6 and 8 include two additional paragraphs inserted between the two quoted paragraphs which address the "tire loader assembly."

12

Plaintiffs argue for, respectively, "directly or indirectly attached" and "directly or indirectly connected." They assert that the construction of this term should not include a function other than the function inherent in attaching one member to another.

This Court is not convinced that either party has suggested a correct construction of "operatively."

Plaintiffs' proposed construction ("directly or indirectly") is simply too vague and does not take into account the specification, which states that the top plate has a "rigidly affixed" upper mold and the bottom plate has a "fixedly attached" bottom mold. (Col. 3, ll. 27-29.) Defendants' proposed construction ("to achieve an intended function") incorporates a "function," but fails to identify such function, and the Court is unable to ascertain what that function might be. At best it could only be the function of "attaching" or "connecting," since no additional function can be incorporated to further limit the claims.[6]

---

[6] Defendants rely on *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004)), for the proposition that the term "operatively" is "often used descriptively in patent drafting to mean 'effectively' in describing the functional relationship between claimed components." The Court does not find this to be particularly helpful or applicable in the instant case.

In *Cross Medical*, the owner of a patent for orthopedic surgical implants used to stabilize and align spinal bones sued a competitor for infringement. One of the disputed terms was "operatively joined" contained in Claim 5 of the patent which recited in part:

> A fixation device for the posterior stabilization of one or more bone segments of the spine, comprising:
>
> at least two anchors and an elongated stabilizer comprising a rod having a diameter and a longitudinal axis, said anchors each comprising anchoring means which secure said anchors to said bone segment and an anchor seat means which has a lower bone interface *operatively joined* to said bone segment and an anchor seat portion spaced apart from said bone interface including a channel to receive said rod [. . .].

*Cross Medical*, 424 F.3d at 1299 (some italics omitted). The district court construed "operatively joined" to mean "connect[ed] during a surgical procedure," i.e., during an "operation." *Id.* at 1305. It rejected a construction of "operatively" to mean "to produce an appropriate effect," stating that this would improperly import a limitation from the specification. *Id.* The alleged infringer had argued that "operatively" meant "to produce an effect," specifically, to produce micro-motion, that is, limited motion between the anchor and the bone. It argued on appeal that the district court's construction of "operatively joined" rendered "operatively" superfluous. Cross Medical argued that,

The Court concludes that a better construction than either of those proposed by the parties has to do with the movement of the component parts, that is, the components that are "operatively" connected or attached in every instance move together in a single movement. For example, when the top plate moves up or down, the "operatively attached" upper tire mold moves with it in a single movement; it does not need to be separately moved. While it is easy to see how a top plate positioned above an upper tire mold could *push* even an unconnected tire mold down as the top plate moves down, in order for the upper tire mold to go back *up*, it would need to be attached to the top plate. Thus, when the tire press "operates," these two components move together. The same is true of the bottom plate and the bottom tire mold. Similarly, when the holder arm on the green tire holder moves in and out of the tire press, it takes the "tire tray" along with it in both directions because the two are "operatively connected."

Accordingly, the Court construes the term "operatively attached" as meaning "attached, either directly or indirectly, so as to move together when [the tire press is] operated" and "operatively connected" means "connected, either directly or indirectly, so as to move together when [the green tire holder is] operated."

---

even if "operatively" were construed to mean "effectively," the effect was posterior stabilization of the spine, not micro-motion.

The Federal Circuit construed "operatively" to mean, in the context of the written description, "effective to produce posterior stabilization." *Id*. at 1306. Thus, "in claim 5, the 'lower bone interface [is] operatively joined to said bone segment' when the interface and the bone segment are connected and in contact such that the device is effective to perform posterior stabilization." *Id.*

In the instant case, there is no separate function that is being performed by way of the connectedness or attachedness of the relevant components.

### III. CONCLUSION

As discussed above, the Court construes the disputed terms as follows:

(1) **"opening/closing means"** in Claims 1, 4, 6 and 8 includes the following structures: "guide rods and hydraulic cylinders and their equivalents;"

(2) **"providing"** in Claims 1, 2, 3, 4, 6, 7, and 8 means "supplying or making available;" and

(3) **"operatively attached"** in Claims 1, 4, 6, and 8, and **"operatively connected"** in Claims 1, 3, 6, and 8 means "attached/connected, either directly or indirectly, so as to move together when operated."

### IV. SUBSEQUENT PROCEEDINGS

Now that the Court has construed the disputed terms, counsel shall confer and, by July 1, 2011, submit in writing their joint proposal as to deadlines for discovery (both non-expert and expert) with respect to infringement, validity and damages; dispositive motions; final pretrial conference; and trial date. Counsel shall also indicate whether there is any interest in pursuing Alternative Dispute Resolution and, if so, (1) how they would propose fitting that into the schedule, and (2) what method of ADR they would prefer to use.[7]

**IT IS SO ORDERED**.

Dated: June 17, 2011

                                      **HONORABLE SARA LIOI**
                                      **UNITED STATES DISTRICT JUDGE**

---

[7] There are several methods available: use of the Court's ADR panel, use of the services of the assigned magistrate judge, use of another district court judge or magistrate judge, and private ADR.